## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| ALLASIA LANGSTON,<br>　　　*Plaintiff,*<br><br>v.<br><br>UNITED STATES OF AMERICA,<br>　　　*Defendant.* | No. 3:19-cv-2020 (MPS) |

## RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff Allasia Langston filed suit against the United States of America under the Federal Tort Claims Act, 28 U.S.C. §§ 1346 and 2671, *et seq.* ("FTCA").  Langston's complaint alleges one count of negligence based on her allegation that she slipped and fell at the Bridgeport Post Office on January 13, 2018.  The Government moves for summary judgment on this claim.  For the reasons set forth below, the Government's motion for summary judgment is DENIED without prejudice.

**I.　　　　Factual Background**

The United States Postal Service operates a full-service post office located at 120 Middle Street, Bridgeport, CT ("Post Office").  ECF No. 31-2 at ¶ 1; ECF No. 32-1 at Section I, ¶ 1. The Post Office is located in an historic building and has terrazzo floors in the lobby area.  ECF No. 31-2 at ¶ 2; ECF No. 32-1 at Section I, ¶ 2.

**　　　A.　Langston's Fall**

On Saturday, January 13, 2018, Langston left her house around 12:00 p.m., or at some point "in the 12 o'clock hour," and drove to the Post Office to mail something.  ECF No. 31-2 at ¶ 40; ECF No. 32-1 at Section I, ¶ 40.  She was wearing Ugg all-weather boots.  ECF No. 32-1 at

Section II, ¶ 3.  According to Langston, it took her seven to ten minutes to drive from her home to the Post Office.  ECF No. 32-1 at Section II, ¶ 5.  Langston testified at her deposition that she parked on a side street.  ECF No. 32-3 at 9[1].  According to Langston, there were "hills of snow … pushed over from shoveling and that" on the ground that day.  *Id.* at 7.  According to Langston, she had to help her daughter out of the car upon arrival at the Post Office due to the hills of snow, and she and her daughter had to step on snow in order to get out of the car.  ECF No. 32-1 at Section II, ¶ 8; ECF No. 32-3 at 16.  At her deposition, Langston initially testified that "a walkway … was cleared" and that "[y]ou didn't have to step on any snow" to enter the Post Office, but she then stated that she could not recall whether she had to "walk across hills of snow" to enter the Post Office.  ECF No. 34-1 at 16-17.  She also testified that she could not recall if there was snow on the stairs leading into the Post Office.  ECF No. 32-3 at 17.  Langston submitted a weather report for January 13, 2018 that indicates that while there was rain in the early morning hours, there was no precipitation after 3:39 a.m.  ECF No. 32-13 at 4.  That report also indicates that temperatures were above freezing in the early morning hours but had dropped to 32 degrees by 9:52 a.m. and continued to drop throughout the day.  *Id.*

Langston entered the Post Office through the north entrance, which is also known as the Golden Hill Street entrance.  ECF No. 31-2 at ¶ 42; ECF No. 32-1 at Section I, ¶ 42.  That entrance has stairs leading up from the sidewalk to the outside doors of the Post Office.  ECF No. 31-2 at ¶ 6; ECF No. 32-1 at Section I, ¶ 6.  There are marble pillars located on either side of the stairs.  *Id.*  The Government has presented evidence that there were yellow caution signs affixed to the pillars stating "CAUTION SLIPPERY WHEN WET" on January 13, 2018.  ECF No. 31-2

---

[1] This ruling cites ECF page numbers throughout.

at ¶¶ 7-8.  Langston testified at her deposition that she did not remember whether the signs were there when she entered the Post Office that day.  ECF No. 31-4 at 12.

Upon moving through the outside doors at the Golden Hill Street entrance, Post Office customers enter a vestibule area, which leads to another set of doors to the Post Office lobby.  ECF No. 31-2 at ¶ 9; ECF No. 32-1 at Section I, ¶ 9.  The Government has presented evidence that blue rugs are located in the vestibule area all year long, and that additional runners are placed there during the winter months.  ECF No. 31-2 at ¶¶ 10-12.  Langston does not recall whether she saw rugs in the vestibule area on January 13, 2018.  ECF No. 32-1 at ¶¶ 10-12.  Langston also does not remember if she saw water or debris on the floor of the vestibule area, and she does not remember slipping in that area.  ECF No. 31-2 at ¶ 48; ECF No. 32-1 at Section I, ¶ 48.

Upon passing through the second set of doors into the lobby, Langston proceeded to her right towards the Post Office's full-service counter to mail a package.  ECF No. 31-2 at ¶ 54; ECF No. 32-1 at Section I, ¶ 54.  According to Langston, the Post Office is very busy on the weekends, and there were about twenty to twenty-five people there.  ECF No. 32-1 at Section II, ¶ 10.  At some point after passing through the doors but before reaching the full-service counter, Langston asserts that she slipped and fell.  ECF No. 31-2 at ¶ 55; ECF No. 32-1 at Section I, ¶ 55 and Section II, ¶ 11.  Langston does not remember whether she saw any water on the floor before she slipped and fell.  ECF No. 31-2 at ¶ 56; ECF No. 32-1 at Section I, ¶ 56.  She testified at her deposition that she did not "remember what the floor was looking like," ECF No. 31-2 at ¶ 49; ECF No. 32-1 at Section I, ¶ 49, but that she did recall that there was no caution sign in the area where her fall occurred.  ECF No. 32-1 at Section I, ¶ 49.  She claims that, after she fell, she observed a pizza-sized puddle of water on the lobby floor.  ECF No. 31-2 at ¶ 57; ECF No. 32-1

3

at Section I, ¶ 57.  Langston does not know how the water got onto the lobby floor, nor how long the water was on the floor prior to her fall.  ECF No. 31-2 at ¶¶ 58-59; ECF No. 32-1 at Section I, ¶¶ 58-59.

The Government presented evidence that there are rugs on the floor of the lobby directly in front of each doorway, and that additional runners are placed in the lobby "[w]hen the weather gets bad."  ECF No. 31-2 at ¶¶ 14-15.  The Government also presented evidence that the Post Office keeps two caution cones at the lobby entrances year-round and that the Post Office adds additional caution signs, as well as floor fans intended to keep the floor dry, during the winter months.  ECF No. 31-2 at ¶¶ 18-20.  Langston does not recall seeing any rugs, caution signs, or floor fans in the lobby.  ECF No. 32-1 at Section I, ¶¶ 14-15 18-20.

The parties dispute how frequently and thoroughly Post Office employees inspected the lobby on January 13, 2018.  While Jonathan Duberry, the custodian working the morning of January 13, testified at his deposition that he checks the lobby somewhere between every fifteen minutes and every forty-five minutes, depending on the weather, ECF No. 32-6 at 14, he also provided a written statement indicating that he checks the lobby "every 30 to 45 minutes for wet spots" during inclement weather.  ECF No. 32-7 at 2.  According to Langston, this discrepancy between his testimony and his written statement creates uncertainty regarding how frequently Duberry actually checked the lobby.

The parties also dispute whether Duberry conducted an inspection of the lobby shortly before Langston fell.  Duberry testified that he was scheduled to work until 12:30 p.m. on Saturdays in January of 2018, although he would work past 12:30 if he found he needed to clean something near the end of his shift.  ECF No. 32-6 at 17-18.  Duberry also testified that he conducted a final check of the lobby floor before leaving, and that he did so "[p]robably around

4

12:15, 12:20 … [s]omewhere in there." *Id.* at 17. As noted above, Langston left her house

around 12:00 p.m., or at some point "in the 12 o'clock hour," to drive to the Post Office, ECF

No. 31-2 at ¶ 40; ECF No. 32-1 at Section I, ¶ 40, and (according to Langston) it took seven to

ten minutes to drive to the Post Office from her home, ECF No. 32-1 at Section II, ¶ 5. Given

the uncertainty regarding what time Duberry conducted his final check of the lobby and what

time Langston arrived at the Post Office, it is not clear whether Duberry checked the lobby

before or after Langston's fall.

The parties also dispute whether the Post Office has a clear policy for what specifically

should happen if an employee sees something on the ground. Langston points out that Orlando

Giddiens, the Post Office's Supervisor of Operations, testified at his deposition that an employee

should report any liquid on the ground to a supervisor, manager, or custodian—"whoever they

can find first." ECF No. 32-5 at 12-13. Duberry testified at his deposition that an employee who

sees something on the ground should call a custodian to clean it up. ECF No. 32-6 at 12.

Giddiens also testified that he was "not sure" if the Post Office had a policy requiring employees

to report a fall if they witness one, but he indicated that the employee should report it to a

supervisor or manager. ECF No. 32-5 at 20. The Government contends that this testimony does

not indicate a lack of clear procedure, as both Giddiens and Duberry were clear that spills should

be reported. ECF No. 34-1 at 7.

B. Events Following Langston's Fall

According to Langston, a Post Office employee who was behind a counter observed

Langston on the ground immediately after her fall and peeked over to ask if she was all right.

ECF No. 32-1 at Section II, ¶ 19. According to Langston, this employee was Hispanic, was in

her thirties, and had brown, shoulder-length hair. *Id.* at Section II, ¶ 20. Langston also asserts

that after her fall, another female employee brought a cone to the spot where the fall had occurred but did not speak to Langston.  *Id.* at Section II, ¶ 21.  According to Langston, this employee was around 50 years old, "had shoulder-length hair, was white, about five foot three inches and was thin."  *Id.* at Section II, ¶ 23.  According to Langston, a third employee—who was female, of medium build, and wearing a uniform—spoke to the employee who brought the cone over.  *Id.* at Section II, ¶¶ 24-25.  According to Langston, this third employee did not speak to her.  *Id.* at Section II, ¶ 26.[2]

After getting up from her fall, Langston proceeded to the full-service counter to mail her package.  ECF No. 31-2 at ¶ 68; ECF No. 32-1 at Section I, ¶ 68.  She did not tell anyone at the counter—or any other Post Office employee—that there was water on the floor or that she had fallen.  ECF No. 31-2 at ¶¶ 69-70; ECF No. 32-1 at Section I, ¶¶ 69-70.  She did not ask anyone for assistance or medical care.  ECF No. 31-2 at ¶ 71; ECF No. 32-1 at Section I, ¶ 71.  She did not fill out an incident report on January 13, 2018, and she never returned to the Post Office to complete an incident report.  ECF No. 31-2 at ¶ 72; ECF No. 32-1 at Section I, ¶ 72.  A search of all records at the Post Office indicates that no complaints were made at any time on January 13, 2018 regarding a fall in the lobby.  ECF No 31-2 at ¶ 38; ECF No. 32-1 at Section I, ¶ 38.

On June 24, 2019, Langston's attorney filed an administrative claim with the United States Postal Service District Tort Claims Coordinator on Langston's behalf.  ECF No. 31-2 at ¶ 77; ECF No. 32-1 at Section I, ¶ 77.  On January 13, 2020, the Post Office denied Langston's claim.  ECF No. 31-2 at ¶ 78; ECF No. 32-1 at Section I, ¶ 78.

C.  Surveillance Video

---

[2] The Government contends that no Post Office employees saw Langston fall or were aware that she fell on January 13, 2018.  *See* ECF No. 31-2 at ¶¶ 62-66, 101.

The Post Office has video surveillance cameras that capture footage of the Post Office lobby and the entrances to it. ECF No. 32-1 at Section II, ¶¶ 56-57. The Post Office preserves video recordings captured by these cameras for 30 days; after 30 days, the recordings are deleted. *Id.* at ¶¶ 58-60. Giddiens is responsible for the video camera system used to record video of activity in the customer access area of the Bridgeport Post Office. ECF No. 31-2 at ¶ 96; EF No. 32-1 at Section I, ¶ 96. The video for January 13, 2018 was automatically deleted on February 12, 2018, in accordance with the Post Office's normal operating procedures. ECF No. 31-2 at ¶ 99; EF No. 32-1 at Section I, ¶ 99. Giddiens stated in a declaration that he was unaware of Langston's allegation that she had fallen on January 13 when the video was deleted. *Id.*

The week that Langston fell, she hired the law firm of Kernan, Scully, & McDonald to represent her. ECF No. 32-1 at Section II, ¶ 46. Attorney David Scully, of that firm, states in a sworn affidavit that upon opening a new file involving premises liability, he sends a letter of representation to the property owner, person or entity against whom a claim will be brought. *Id.* at Section II, ¶ 47. According to her sworn affidavit, Shanequa Camp, Attorney Scully's paralegal, will type the letter and place it in his Attorney Scully's bin with an envelope, and he will sign the letter and return it to Camp. *Id.* at Section II, ¶ 48. Camp will then stamp the letter and place it in a bin within the office containing mail to be mailed that day. *Id.* at Section II, ¶ 49. According to Camp's affidavit, in January of 2018, a firm staff member would then bring all the stamped envelopes in the bin to the Post Office box on Grand Street in Waterbury at 11:00 a.m., 3:00 p.m., and 5:00 p.m. each day. *Id.* at Section II, ¶ 50.

Attorney Scully signed a letter addressed to the "Manager" of Post Office and dated January 26, 2018, requesting that any surveillance, security, incident report or other evidence related to the January 13 incident be preserved. *Id.* at Section II, ¶ 51; ECF No. 32-11 at 2. The

metadata for the word document containing this letter confirms that it was last edited on January 26, 2018 at 11:57 a.m.  ECF No. 32-1 at Section II, ¶ 52.  Although Attorney Scully does not specifically recall signing this letter, he confirms in his sworn affidavit that the signature on the letter is his, and that there is no reason that the letter would have been typed, printed, signed, and copied, but then not mailed.  *Id.* at Section II, ¶ 53.  Camp also confirms in her sworn affidavit that if a letter is typed, printed, and signed, and the firm has a copy of it in its file, there is no reason that letter would not have been mailed.  *Id.* at Section II, ¶ 54.

The Government asserts that Post Office never received the letter.  It presents evidence that Postmaster Gary Thompson, the lead manager for the Bridgeport Post Office at the relevant time, would have received any correspondence addressed to the "Manager" of the Post Office. ECF No. 31-2 at ¶¶ 88-89; ECF No. 32-1 at Section I, ¶¶ 88-89.  It also presents evidence that it is standard procedure that any correspondence received by the Postmaster's Office regarding maintenance issues, video recordings made at the Post Office, incidents that occurred in the lobby area of the Post Office, and matters related to custodial staff is forwarded to Giddiens "for attention and appropriate action."  ECF No. 31-2 at ¶ 90; ECF No. 32-1 at Section I, ¶ 90. Postmaster Thompson stated in a declaration that he did not receive a copy of Attorney Scully's January 26 letter.  ECF No. 31-2 at ¶ 91; ECF No. 32-1 at Section I, ¶ 91.  Giddiens also states in a declaration that he did not receive the letter and that, if he had, he would have ensured that video recordings from January 13 were downloaded and preserved.  ECF No. 31-2 at ¶¶ 95, 100; EF No. 32-1 at Section I, ¶¶ 95, 100.  In January 2018, Giddiens reported to Lawrence McLeain, Acting Manager of Customer Service Support at the Post Office.  ECF No. 31-2 at ¶¶ 92-93; ECF No. 32-1 at Section I, ¶¶ 92-93.  McLeain stated in a declaration that he did not receive a copy of the letter.  ECF No. 31-2 at ¶ 94; ECF No. 32-1 at Section I, ¶ 94.  According to the

Government, the Post Office did not become aware of Langston's fall until August 20, 2018, when its Torts Claim Section received a different letter from Attorney Scully.  ECF No. 31-2 at ¶ 75.

## II.     Legal Standard

"Summary judgment is appropriate only if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (internal quotation marks and citations omitted).  In reviewing the summary judgment record, a court must "construe the facts in the light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013).  "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013).  The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986).  If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## III.    Discussion

Langston claims that the Government is liable for her personal injuries because it was negligent in maintaining safe conditions at the Post Office, leading to her fall.  In its motion for summary judgment, the Government argues that the plaintiff has failed to present any evidence from which a reasonable factfinder could infer that it had notice of the defect or hazard that

caused the plaintiff to slip and fall.  I conclude that the Government is not entitled to summary judgment due to the parties' dispute regarding the non-preservation of surveillance video of the Post Office lobby from the day of Langston's fall.

      A.  <u>Applicable Law</u>

Langston brings her negligence action pursuant to the FTCA.  "The applicable law to a claim against the Government under the FTCA is the law that the state where the tortious incident took place would apply 'in like circumstances involving a private defendant.'" *Silverman v. United States,* No. CV 04–5647 (ETB), 2008 WL 1827920, at \*12 (E.D.N.Y. Mar. 28, 2008) (quoting *Caban v. U.S.,* 728 F.2d 68, 72 (2d Cir.1984)); *Davis v. United States,* 430 F. Supp. 2d 67, 73 (D. Conn. 2006) ("Under the FTCA the government's liability is determined by the application of the law of the place where the act or omission occurred.").  Connecticut law would apply if Langston brought a negligence action against a private defendant, so Connecticut law applies to this action.

Under Connecticut law, "[t]he essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury."  *Baptiste v. Better Val-U Supermarket, Inc.*, 811 A.2d 687, 690 (Conn. 2002).  In this case, the Government does not dispute that Langston was a business invitee and that the Government therefore owed her a duty to maintain its premises in a reasonably safe condition.  ECF No. 31-1 at 9; s*ee also Kelly v. Stop and Shop, Inc.*, 918 A.2d 249, 255 (Conn. 2007).  To hold the Government liable for her injuries, Langston must prove that the Government had notice of the hazard that caused them.  Specifically, Langston must show that the Government "had actual notice of the presence of the specific unsafe condition which caused [her injury] or constructive notice of it."  *Kelly*, 918 A.2d at 255 (quoting *Baptiste*, 811 A.2d at 691).  "The notice, whether actual or constructive, must be

notice of the very defect which occasioned the injury and not merely conditions naturally productive of that defect even though subsequently in fact producing it." *Id.* (alteration omitted).

Here, Langston does not contend that the Government had actual notice of the puddle of water that she asserts caused her to slip and fall. *See* ECF No. 32-1 at Section I, ¶ 60 (admitting that Langston has no evidence indicating that any Post Office employee knew there was water on the lobby floor prior to her fall). Thus, the question is whether the Government had constructive notice of the puddle. "To establish constructive notice, [Langston] must adduce some evidence, either direct or circumstantial, that establishes the length of time the defect was present." *Navarro v. Kohl's Dept. Stores, Inc.*, No. 5-CV-843 (DJS), 2007 WL 735787, at *4 (D. Conn. Mar. 8, 2007); *see also Gulycz v. Stop & Shop Companies, Inc.*, 615 A.2d 1087, 1088 (Conn. App. 1992) ("Whether the defendant had constructive notice of [the alleged defect] turns on whether the [defect] existed for a length of time sufficient for the defendant's employees, in the exercise of due care, to discover the defect in time to have remedied it.")

      B.  <u>Application to Facts of This Case</u>

The Government argues that Langston has presented no evidence from which a trier of fact could infer that the Government had constructive notice of the presence of the water on which she slipped. Langston has presented no evidence indicating where the water came from or how long it was on the floor before she fell; rather, Langston testified at her deposition that she observed the water after she fell. But the presence of the water on the floor at the point in time when Langston fell cannot support an inference of constructive notice because "without at least some evidence of how long [the water was on the floor], it would be too speculative to infer that the water was on the floor for any more than 'minutes or even seconds.'" *Navarro*, 2007 WL 735787, at *5 (quoting *Deptula v. New Britain Trust Co.*, 19 Conn. Supp. 434, 43-37 (1955)).

11

Courts within this district, applying Connecticut negligence law in slip and fall cases, have

repeatedly granted summary judgment against plaintiffs who were unable to present evidence

regarding how long a hazard existed before they fell.  *See Camera v. Target Corp.*, No. 18-CV-

95 (KAD), 2020 WL 3051751, at *7 (D. Conn. June 8, 2020) (granting summary judgment to the

defendant because the plaintiff failed to present any evidence of constructive notice, where "the

evidence 'goes no farther than to show the presence of a slippery foreign substance'") (quoting

*Kelly*, 918 A.2d at 256); *Gomes v. United States*, No. 11-CV-1825 (VLB), 2012 WL 5869801, at

*7 (D. Conn. Nov. 19, 2012) (granting summary judgment to the defendant because the plaintiff

failed to present any evidence of constructive notice, where "the only evidence that the wet

leaves on which Plaintiff fell existed *prior* to his fall is Plaintiff's assertion that he fell and

noticed the leaves upon falling") (emphasis in original); *Navarro*, 2007 WL 735787, at *5

(granting summary judgment to the defendant because the plaintiff failed to present any evidence

of constructive notice, where "the only evidence that the defect existed prior to [the plaintiff]'s

fall is that she fell").  Thus, Langston's evidence that the water was present on the lobby floor at

the time that she fell is insufficient to support an inference that the Post Office had constructive

notice.

### 1. Reasonableness of Lobby Inspections

Langston argues that a factfinder may infer constructive notice from the Post Office's

allegedly inadequate inspections of its lobby.  *See* ECF No. 32-2 at 10-12.  However, the

authority Langston cites does not support this argument.  For example, Langston quotes the

Connecticut Superior Court's statement in *Lunney v. Taubman Co., LLC*, that "when a possessor

of land fails to make or to have made a *reasonable inspection* which would have disclosed the

dangerous condition, his negligent ignorance is, in the eyes of the law, equivalent to actual

12

knowledge." No. FSTCV 166029324S, 2018 WL 1659485, at *7 (Conn. Super. Ct. Mar. 5, 2018) (quoting *Hall v. Burns*, 213 Conn. 446, 479 (1990)) (emphasis in original). But this quotation merely explains what constructive notice is, and as it highlights, the "reasonable inspection" referenced would need to have "disclosed the dangerous condition" in order for the defendant to have constructive notice. Indeed, the quoted language follows a sentence that reflects the importance of the duration of the dangerous condition in determining whether the property owner's inspection was reasonable: "A possessor of land is charged with constructive notice of the dangerous condition when it is of such a nature and *duration* that a *reasonable inspection* would have disclosed the risk." *Id.* (quoting *Hall*, 213 Conn. at 479) (first emphasis added). All of this language is consistent with the case law above requiring a plaintiff to submit some evidence of the duration of the dangerous condition. As I explained above, Langston has offered no evidence that a reasonable inspection would have disclosed the presence of the water on which she slipped because she has presented no evidence indicating where the water came from or how long it was on the lobby floor prior to her fall. Thus, even if the Post Office thoroughly inspected its lobby as frequently as every few minutes, there is no evidence that such inspections would have disclosed the presence of the water. As a result, even a determination that Post Office employees inspected the lobby on an unreasonably infrequent basis or in an inadequately thorough manner would not support the inference that the Post Office had constructive knowledge of the presence of the puddle of water.

Langston also cites *Dominguez v. United States* as support for her unreasonable inspection argument. In that case, the plaintiff brought a negligence action alleging that she slipped and fell on a snowy and icy path. 963 F. Supp. 2d 107, 110 (D. Conn. 2013). The court, in determining that the defendant had at least constructive notice that the path was icy based on

13

the plaintiff's evidence that "everyone was talking about the fact that" the path had been slippery for days due to accumulated snow and ice, also noted that the defendant's employees had inspected the path about one hour and fifteen minutes before the plaintiff's fall. *Id.* at 122.  The court did not indicate that a gap of one hour and fifteen minutes between the inspection and the fall somehow supported the conclusion that the defendant had constructive notice.  Thus, *Dominguez* also does not support Langston's argument that summary judgment may not be granted due to disputes about the timing and extent of the Post Office's inspections of its lobby.

2.   Presence of Snow Outside

Langston also argues that the presence of snow on the ground on the day of her fall supports an inference that the Post Office had constructive notice of the puddle of water on the lobby floor.  ECF No. 32-2 at 13-15.  This argument also fails.  As I noted above, the Connecticut Supreme Court has emphasized that the defendant must have notice "of the very defect which occasioned the injury and not merely conditions naturally productive of that defect even though subsequently in fact producing it."  *Kelly.*, 918 A.2d at 255 (quoting *Baptiste*, 811 A.2d at 691) (alteration omitted).  Here, the defect that occasioned Langston's injury is the puddle of water on the lobby floor. The hills of snow are at most "conditions naturally productive of that defect."  *Id.*  Thus, a reasonable factfinder could not infer from Langston's evidence regarding the hills of snow that the Post Office had constructive notice of the defect that caused her to fall.

The authority Langston cites does not compel a different result.  She points to the *Dominguez* case, but in that case, the hazard at issue was the snowy and icy path on which the plaintiff claimed to have slipped.  963 F. Supp. 2d at 110.  There, the plaintiff's evidence that "everyone" knew that the path was slippery on the morning of her fall due to ice and snow that

14

had not been cleared, together with her evidence that the temperatures on the days leading up to and the day of her fall had "fluctuated below and above the freezing point such [that] the snow and ice existing on the ground could have melted and refrozen," indicated that the hazard had existed for a period of time before the plaintiff slipped. *Id.* at 122. That evidence could, the court concluded, support an inference that the hazard had existed for long enough that the defendant, in the exercise of reasonable care, should have discovered it (and that the defendant, therefore, had constructive knowledge of the hazard). *Id.* Here, Langston does not claim that she slipped on hills of snow outside the Post Office. Rather, she asserts that she slipped on water inside the Post Office lobby. Thus, unlike in *Dominguez*, evidence regarding the presence of snow and the weather on the day of the fall is not probative of how long the hazard (here, the puddle of water) existed.

Langston also points to two unpublished Connecticut Superior Court decisions that indicate that in certain circumstances, evidence regarding weather conditions outside may be probative of whether a defendant had constructive knowledge of a hazard inside. In *Fragoso v. Stop & Shop Companies, Inc.*, the plaintiff slipped on water on the floor near the entrance of a grocery store. No. 099317, 1991 WL 231567, at * 1 (Conn. Super. Ct. Oct. 31, 1991). The court indicated that "continuous rain with pedestrian traffic coming into the store was sufficient to put the defendant on notice that water would be tracked in and deposited on the floor." *Id*. In *Lunney*, the plaintiff slipped on a wet painted line just inside a parking garage. 2018 WL 1659485, at *7. The court, citing *Fragoso*'s observation that the combination of continuous rain and pedestrian traffic put the defendant in that case on notice of the hazard, stated that "[t]he same would seem to be true for the area of a parking garage near the entrance, at the bottom of a

sloped ramp, with cars driving into the garage with water dripping from the cars as would/should be expected (in addition to the possible direct flow of rain down the ramp)." *Id.*

Assuming that *Fragoso* and *Lunney* accurately apply Connecticut's law regarding constructive notice, I nevertheless conclude that these cases do not support Langston's argument that her testimony regarding the hills of snow can support an inference of constructive notice. Unlike the plaintiffs in those cases, Langston presented no evidence that it was continuously raining at the time that she entered the building in question (here, the Post Office) and slipped. Langston's claim that it was "above freezing for several hours prior to [her fall], and there was light rain, demonstrating that snow would be melting onto the walkways and being stepped on by customers and tracked into the Post Office," ECF No. 32-2 at 14-15, is not supported by the weather report she herself submitted.  That report shows that there was no precipitation after 3:39 a.m. on the day of Langston's fall, and that temperatures were at or below freezing from 9:52 a.m. onwards.  ECF No. 32-13 at 4.  Langston has presented no other evidence indicating that there was melted snow on the walkways leading into the Post Office, and she indicated at her deposition that she could not remember whether there was snow on the walkway or steps leading into the Post Office.  ECF No. 34-1 at 16-17; ECF No. 32-3 at 17.  Langston's evidence that she and her daughter had to step on "hills of snow … pushed over from shoveling and all that" in order to get out of their car, which was parked on the street, ECF No. 32-3 at 7, 9, 16; ECF No. 32-1 at Section II, ¶ 8, cannot support an inference by a reasonable factfinder that Post Office customers were on January 13, 2018 tracking in snow and water in such a manner that the Post Office would have had constructive notice of the presence of water on the lobby floor.

### 3.  Failure to Preserve Surveillance Video

Despite the fact that there is no evidence of constructive notice in the existing record, I

cannot grant summary judgment to the Government due to the parties' dispute in a pending motion for sanctions (ECF No. 33) regarding the Government's failure to preserve the surveillance video from the day that Langston claims she fell.  There appears to be a factual dispute about whether the Government received a January 26, 2018 letter from Langston's counsel requesting preservation of the surveillance video.  But because the briefs supporting and opposing the motion for sanctions do not address the legal implications of the evidence presented regarding the mailing and non-receipt of the January 26, 2018 letter, I cannot resolve that motion without supplemental briefing, which I have ordered.  And because this issue remains undecided, there remains the possibility that I will decide to impose measures under Fed. R. Civ. P. 37(e)(1), which could include permitting the factfinder in this case (the Court) to consider the fact that the surveillance video was not preserved.  If I imposed such a measure, then a reasonable factfinder could infer from the Government's non-preservation that the video contained evidence adverse to the Government.  In that circumstance, summary judgment would be inappropriate, although whether such an adverse inference should be drawn and whether it would be enough to prove Langston's claim that the Government had constructive notice of the water on the lobby floor are questions I would then need to decide, after a trial, as the factfinder.  At this point, then, I cannot conclude as a matter of law that there is no evidence from which a reasonable factfinder could infer that the Government had constructive notice of the alleged defect, and so I cannot grant summary judgment to the Government.  If, after supplemental briefing on the motion for sanctions, the Government is able to show from the existing evidence its non-receipt of the letter as a matter of law, I will permit the Government to renew its motion for summary judgment on the existing record and briefs.

### IV.        Conclusion

The Defendant's motion for summary judgment (ECF No. 31) is DENIED without prejudice.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
            September 30, 2021